02-10-255-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-10-00255-CV

 

 


 
 
 In the Interest of A.S.D.,
 A Child
 
 


 

 

----------

FROM THE 393rd
District Court OF Denton COUNTY

----------

MEMORANDUM
OPINION[1]

----------

Appellant
V.Z. appeals from the trial court’s termination of her parental rights to daughter
A.S.D., who sustained life-threatening injuries at the hands of C.N., V.Z.’s
boyfriend (Boyfriend).  V.Z. contends that the evidence is insufficient to
support the trial court’s findings under (D), (E), and (O) and the best
interest finding; that the trial court abused its discretion by denying her
motion to extend the one-year dismissal deadline; and that she was deprived of
due process, due course of law, and equal protection.  Because we hold that the
evidence is sufficient to support the endangerment findings, that the trial
court did not abuse its discretion by refusing to extend the dismissal
deadline, and that V.Z. forfeited her constitutional issues by failing to
preserve them below, we affirm the trial court’s judgment.

I. 
Sufficient Evidence to Support Termination

In
her first two issues, V.Z. appears to contend that the evidence is legally and
factually insufficient to support the trial court’s endangerment and best
interest findings.[2]  We note that V.Z. did
not raise legal sufficiency of the evidence to support the best interest
finding in her statement of points.  Under former section 263.405(i), which
controls this case,[3] V.Z. has waived any legal
sufficiency issue regarding the best interest finding.[4] 
While V.Z. did not distinctly raise legal sufficiency of the evidence to
support the endangerment findings in her statement of points, however, we
liberally construe her “[n]o evidence” subpoints to her factual sufficiency
endangerment issues in the statement of points as raising legal sufficiency
issues on endangerment.  We therefore address both her legal and factual
sufficiency issues regarding the endangerment findings.

A. 
Standard of Review

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.[5] 
Both elements must be established; termination may not be based solely on the
best interest of the child as determined by the trier of fact.[6]

Termination
decisions must be supported by clear and convincing evidence.[7]  Evidence is clear and
convincing if it “will produce in the mind of the trier of fact a firm belief
or conviction as to the truth of the allegations sought to be established.”[8]  Due process
demands this heightened standard because termination results in permanent,
irrevocable changes for the parent and child.[9]

In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the grounds for termination were proven.[10]  We review all
the evidence in the light most favorable to the finding and judgment.[11]  We resolve any
disputed facts in favor of the finding if a reasonable factfinder could have
done so.[12] 
We disregard all evidence that a reasonable factfinder could have disbelieved.[13]  We consider undisputed
evidence even if it is contrary to the finding.[14]  That is, we consider
evidence favorable to termination if a reasonable factfinder could, and we
disregard contrary evidence unless a reasonable factfinder could not.[15]

We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.[16]  And even when
credibility issues appear in the appellate record, we defer to the factfinder’s
determinations as long as they are not unreasonable.[17]

In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our own.[18]  We determine
whether, on the entire record, a factfinder could reasonably form a firm
conviction or belief that the parent violated subsections (D) and (E) of
section 161.001(1) and that the termination of the parent-child relationship
would be in the best interest of the child.[19] 
If, in light of the entire record, the disputed evidence that a reasonable
factfinder could not have credited in favor of the finding is so significant
that a factfinder could not reasonably have formed a firm belief or conviction
in the truth of its finding, then the evidence is factually insufficient.[20]

B.  Treatment
of Findings of Fact

Findings
of fact are the exclusive province of the factfinder.[21]  Findings of fact entered in
a case tried to the court have the same force and dignity as a jury=s
answers to jury questions.[22] 
The trial court=s findings of fact are
reviewable for legal and factual sufficiency of the evidence to support them by
the same standards that are applied in reviewing evidence supporting a jury=s
answer.[23]

But
when findings of fact are filed and are unchallenged, they occupy the same
position and are entitled to the same weight as the verdict of a jury; they are
binding on an appellate court unless the contrary is established as a matter of
law or there is no evidence to support the finding.[24]

C.  Endangerment

1. 
The Law

As
we have explained in a similar case,

Endangerment
means to expose to loss or injury, to jeopardize.  The trial court may order
termination of the parent-child relationship if it finds by clear and
convincing evidence that the parent has knowingly placed or knowingly allowed
the child to remain in conditions or surroundings that endanger the physical or
emotional well-being of the child.  Under subsection (D), it is necessary to
examine evidence related to the environment of the child to determine if the
environment was the source of endangerment to the child’s physical or emotional
well-being.  Conduct of a parent in the home can create an environment that
endangers the physical and emotional well-being of a child.

. . . . Under
subsection (E), the relevant inquiry is whether evidence exists that the
endangerment of the child’s physical or emotional well-being was the direct
result of the parent’s conduct, including acts, omissions, and failures to
act.  Termination under subsection (E) must be based on more than a single act
or omission; a voluntary, deliberate, and conscious course of conduct by the
parent is required.

To
support a finding of endangerment, the parent’s conduct does not necessarily
have to be directed at the child, and the child is not required to suffer
injury.  The specific danger to the child’s well-being may be inferred from
parental misconduct alone, and to determine whether termination is necessary,
courts may look to parental conduct both before and after the child’s
birth . . . . As a general rule, conduct that subjects a
child to a life of uncertainty and instability endangers the child’s physical
and emotional well-being.[25]

Additionally,
a parent’s mental state may be considered in determining whether a child is
endangered if that mental state allows the parent to engage in conduct
jeopardizing the child’s physical or emotional well-being.[26] 
Finally, even if a parent makes dramatic improvements before trial, “evidence
of improved conduct, especially of short-duration, does not conclusively negate
the probative value of a long history of . . . irresponsible
choices.”[27]

2. 
Application of the Law to the Facts

The
record contains the following evidence.  When she was young, V.Z. was abused by
her father and raped by one of his friends.  While she was still in high
school, she met A.S.D.’s father (Father) through a friend.  V.Z. became
pregnant with A.S.D., moved out of state with Father for a short time, returned
to Palestine, Texas, and delivered A.S.D. on October 8, 2007.  V.Z. and A.S.D.
lived with Father’s sister for about six weeks but left after the two women had
a dispute.  V.Z. then returned to her parents’ home with the baby.  After two
to three months, V.Z. and the baby left V.Z.’s parents’ home after V.Z.’s
father hit her, and they moved into a Palestine shelter, where they lived until
September 2008.  At the shelter, V.Z. received assistance with obtaining her
legal status.  She also began having telephone contact in April 2008 with Boyfriend,
a person she had never personally met.

In
September 2008, leaving the shelter only because her “time was up,” V.Z. returned
to her parents’ home with A.S.D., where they stayed about two or three months. 
On December 13, 2008, Boyfriend met V.Z. and A.S.D. in person in Palestine, and
V.Z. travelled with A.S.D. and Boyfriend from Palestine to Whitesboro, Cooke
County, more than a hundred miles away, to live with him there.  V.Z. did not
know any details about where she and her fourteen-month-old would be living.  She
also did not know about Boyfriend’s past cocaine use.

V.Z.
claimed that she moved to enroll in school and that she had a job opportunity
as a waitress but had no one she trusted to look after A.S.D.  She “wasn’t
going to leave [her] baby with [Boyfriend].”  At trial, V.Z. conceded that
taking A.S.D. to live with someone whom she had just met endangered her well-being. 
Whereas V.Z. had family, friends, and the shelter in Palestine to turn to for
help, she knew no one other than Boyfriend in Whitesboro.  Within the first
week, Boyfriend called V.Z. “a whore in Spanish” because he had heard that she
had been unfaithful.  After less than three months in Whitesboro, Boyfriend,
V.Z. and A.S.D. moved to a ranch in Aubrey, Texas.  In Aubrey, Boyfriend shoved
V.Z. once while A.S.D. was present in the home.  V.Z. denied that the baby was
in the same room.  They all stayed in Aubrey about three months and then moved
to a horse ranch in Pilot Point.  At each location, Boyfriend and V.Z. usually
had other roommates, about whom V.Z. appeared to know little.

V.Z.
testified that A.S.D. was always with her.  She also acknowledged, however,
that she let A.S.D. stay with a pregnant friend of Boyfriend’s for a week so
that the friend could find out what it was like to take care of a child.  Finally,
Boyfriend also took care of A.S.D. on July 6, 2009, while V.Z. went to court on
a shoplifting charge and shopped for groceries.

On
July 7 or 8, 2009, A.S.D., who was twenty-one months old, stopped eating and
vomited, so V.Z. took her to Denton Presbyterian Hospital.  The doctor found
bruises on V.Z.’s face and back.  At trial, V.Z. did not remember whether she
had discussed the origin of the bruises then but stated that she would have
done so if the medical personnel had asked.  The medical records indicated,
however, that she did not explain how the bruises occurred.  And she testified
that she “really didn’t know what had happened to [A.S.D.] with the bruising”
despite providing earlier explanations at trial of various falls to account for
them.

Later
that same week, on Saturday, July 11, 2009, Boyfriend interrupted V.Z.’s shower
to tell her that something was wrong with A.S.D.  V.Z. testified that she had
seen A.S.D. a few minutes earlier and that she had been fine.  But A.S.D. was
now “completely pale and she didn’t look right.”  V.Z. and Boyfriend rushed
A.S.D. to the nearest hospital.  V.Z. could tell that A.S.D.’s condition was
deteriorating on the way to the hospital; A.S.D. became dehydrated and was
sleepy.

A.S.D.
was transferred to Dallas Children’s Medical Center later that evening, and she
had surgery in the early morning hours of July 12, 2009.  Doctor Matthew Cox,
board certified in child abuse pediatrics, testified that her injuries were
among the most severe that he had seen a child endure.  The first part of her
small intestine “was torn completely apart,” and she had a laceration to her
pancreas, bruising to her right kidney, tearing of the mesentery (the fatty
tissue through which the blood vessels supply blood to the bowels and the
stomach), and a tear in the mezzo-colon.  The doctor testified that in his
opinion, the life-threatening, internal injuries were non-accidental and had to
have been caused by someone intentionally.  Cox testified that he would expect
a child who had sustained such injuries to cry out or scream and to be in severe
pain.

Dr.
Cox also testified that based on the pathology findings and the description of
the history of when her symptoms began, the injury occurred four to five days
before A.S.D. was rushed to the hospital.  He further testified that V.Z. gave
him no explanation for the external bruising.  A.S.D. was removed from V.Z. on
July 12, 2009.

The
psychologist who evaluated V.Z. within months of A.S.D.’s removal diagnosed V.Z.
with post traumatic stress disorder and major depressive disorder on Axis I and
personality disorder NOS and mixed personality disorder with borderline
paranoid features on Axis II.  The psychologist also testified that V.Z.
admitted that she had attempted suicide at the ages of fifteen and sixteen.

Boyfriend
was the primary suspect in the criminal investigation of A.S.D.’s injuries from
the first week following her hospitalization, and he eventually pled guilty pursuant
to a plea bargain to reckless injury to a child on May 4, 2010, approximately
two months before the termination trial.  Included in his plea papers is a
signed judicial confession.  But even at trial, except for a temporary lapse
based on her perception of Boyfriend’s initial behavior at trial, V.Z.
consistently maintained that she does not know what really happened to A.S.D.
and that she is not sure that he caused A.S.D.’s injuries, offering
explanations of possible accidents or other culprits, specifically, the
couple’s roommates at the time of the injury.

V.Z.
continued to meet with Boyfriend after A.S.D.’s removal.  V.Z. said that she
did so to try to help the police locate him and because she wanted to know what
had happened to A.S.D.  We note that the record is void of any evidence that
she tried to track down her former roommates for the police.  During this time,
V.Z. became pregnant with Boyfriend’s child.  The two pushed and hit each other
even after Boyfriend knew she was pregnant.

V.Z.
continued to visit Boyfriend after he had gone to jail for injuring A.S.D.;
V.Z. testified that she did this to try to find out what happened to A.S.D. and
because his family would give her money.  V.Z. visited Boyfriend in jail at
least fifty times.  V.Z. provided a written statement to Boyfriend’s criminal
defense counsel as well as medical research.

The
trial court’s unchallenged findings of fact include the following:

11.     . . . .  In December 2008, [V.Z.]
met [Boyfriend] in person for the first time.  She took [A.S.D.] and moved over
a hundred miles away from the Palestine area to live with [Boyfriend].  [V.Z.]
moved with [A.S.D.] to an area unknown to her and to which she did not have a
support system to live with a person she had just met.

12.     In 2008, [V.Z.] with [A.S.D.]
lived in a shelter for abuse victims in the Palestine area.  [V.Z.] was aware
that she could return to the shelter.

13.     In December 2008, [Boyfriend] called
[V.Z.] a derogatory name, using the street vernacular for “prostitute”, with
the child present.

14.     Prior to July 2009, [Boyfriend]
pushed [V.Z.] during an argument while [A.S.D.] was in the home.

15.     In April 2009, [V.Z.] engaged
in shoplifting with [A.S.D.] in her care and was arrested for theft during the
incident.

16.     [V.Z.] allowed [A.S.D.] to
stay with an acquaintance of [Boyfriend] for one week so that the acquaintance
could experience what it was like to be a parent.

17.     [A.S.D.] was brought to Denton
Presbyterian Hospital on or about July 8, 2009.  Bruises on the face and back
were observed on [A.S.D.] and [V.Z.] stated to staff that she did not know how
they were caused.

18.     [A.S.D.] was brought to Denton
Regional Medical Center on or about July 11, 2009.  While at the hospital, [V.Z.]
was questioned about the bruises on [A.S.D.]’s face and back.  [V.Z.] provided
no explanation for the cause.

19.     [A.S.D.] was transferred to
Children’s Medical Center, Dallas, on or about July 12, 2009 for severe, life-threatening
abdominal injuries.  The injuries included a transected small intestine, a
laceration to her pancreas, and bruising to her kidney.  The injuries were
indicative of significant blunt force trauma to the abdomen.

20.     While at Children’s Medical
Center, [V.Z.] was questioned by medical staff on more than one occasion about
the bruises on [A.S.D.] and she had no explanation as to how they occurred. 
Initially, [V.Z.] did not provide an explanation for the cause of [A.S.D.]’s
severe abdominal injuries.

21.     [V.Z.] was informed by medical
staff about the nature and severity of the child’s injuries.

22.     Danny Roberts, CPS
investigator, responded to Children’s Medical Center on July 12, 2009.  He
interviewed [V.Z.]  [V.Z.] did not provide him with a plausible explanation for
[A.S.D.]’s injuries.  [V.Z.] was informed by Danny Roberts that her
explanations for the child’s abdominal injuries were not plausible and she
understood that the injuries were nonaccidental.  [V.Z.] acknowledged to Danny
Roberts that if she did not injure [A.S.D.] that [Boyfriend] was the only other
possible perpetrator.

23.     [V.Z.] and [Boyfriend] were
the only caregivers for [A.S.D.] in the days and week prior to the child’s
hospitalization.  [V.Z.] and [Boyfriend] were the only plausible perpetrators
of the abuse on [A.S.D.]

24.     [V.Z.] admitted that [she] and
[Boyfriend] were the only caregivers for [A.S.D.] in the days and week prior to
the child’s hospitalization.

. . . . 

26.     After removal of the child, [V.Z.]
made contradictory statements that others were possible perpetrators of the
abuse of [A.S.D.]

27.     [V.Z.] was aware that law
enforcement and CPS believed [Boyfriend] was responsible for [A.S.D.]’s
injuries.

28.     [V.Z.] continued to maintain
contact with [Boyfriend] during the case, including traveling throughout the
state to meet with him; having a sexual relationship with him[,] and visiting
him in jail until mid-May 2010.

29.     In November 2009, [Boyfriend]
and [V.Z.] were involved in a physical altercation.  [V.Z.] was aware that
shelters were available to assist her and she did not take advantage of this
resource.

30.     [V.Z.] maintained during the
majority of this case that [Boyfriend] was innocent of the allegations that he
caused the injuries to [A.S.D.]  [V.Z.] provided documents and statements to
his criminal defense attorney in support of [Boyfriend].  [V.Z.] does not
believe that [Boyfriend] caused the injuries to [A.S.D.]

31.     [Boyfriend] pled guilty and
was convicted of Injury to a Child of [A.S.D.]

32.     [V.Z.] became pregnant after
the removal of [A.S.D.] and gave birth to the child in May 2010.

. . . . 

38.     [V.Z.] had unstable housing
during the case and stayed with individuals she had “just met[,]” endangering
herself and her unborn child.  [V.Z.] explicitly admitted to going home with
strangers she met in a parking lot or at the jail while visiting [Boyfriend] in
order to maintain a roof over her head.

. . . . 

42.     [V.Z.] has a history of
endangering [A.S.D.]; has a history of unstable housing; and residing with
individuals that she recently met.

The
record contains evidence to support all of these unchallenged findings; accordingly,
we are bound by them.[28]  Consequently, reviewing
the evidence in the light most favorable to the verdict, we hold that the
evidence is legally sufficient to support the trial court’s endangerment
findings.  Further, reviewing all the evidence and giving due deference to the
trial court’s findings, we hold that the evidence is factually sufficient to
support the trial court’s endangerment findings.

D.  Best Interest

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.[29] 
Prompt and permanent placement of the child in a safe environment is also
presumed to be in the child’s best interest.[30] 
The following factors should be considered in evaluating the parent’s
willingness and ability to provide the child with a safe environment:

(1) the child’s age
and physical and mental vulnerabilities;

(2) the frequency and
nature of out-of-home placements;

(3) the magnitude,
frequency, and circumstances of the harm to the child;

(4) whether the child
has been the victim of repeated harm after the initial report and intervention
by the department or other agency;

(5) whether the child
is fearful of living in or returning to the child’s home;

(6) the results of
psychiatric, psychological, or developmental evaluations of the child, the
child’s parents, other family members, or others who have access to the child’s
home;

(7) whether there is
a history of abusive or assaultive conduct by the child’s family or others who
have access to the child’s home;

(8) whether there is
a history of substance abuse by the child’s family or others who have access to
the child’s home;

(9) whether the
perpetrator of the harm to the child is identified;

(10) the willingness
and ability of the child’s family to seek out, accept, and complete counseling
services and to cooperate with and facilitate an appropriate agency’s close
supervision;

(11) the willingness
and ability of the child’s family to effect positive environmental and personal
changes within a reasonable period of time;

(12) whether the
child’s family demonstrates adequate parenting skills, including providing the
child and other children under the family’s care with:

(A) minimally
adequate health and nutritional care;

(B) care, nurturance,
and appropriate discipline consistent with the child’s physical and
psychological development;

(C) guidance and
supervision consistent with the child’s safety;

(D) a safe physical
home environment;

(E) protection from
repeated exposure to violence even though the violence may not be directed at
the child;  and

(F) an understanding
of the child’s needs and capabilities;  and

(13) whether an
adequate social support system consisting of an extended family and friends is
available to the child.[31]

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)     the
desires of the child;

(B)     the
emotional and physical needs of the child now and in the future;

(C)     the
emotional and physical danger to the child now and in the future;

(D)     the parental
abilities of the individuals seeking custody; 

(E)     the
programs available to assist these individuals to promote the best interest of
the child;

(F)     the
plans for the child by these individuals or by the agency seeking custody;

(G)     the stability
of the home or proposed placement;

(H)     the
acts or omissions of the parent which may indicate that the existing
parent-child relationship is not a proper one; and

(I)          
any
excuse for the acts or omissions of the parent.[32]

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.[33]  Furthermore,
undisputed evidence of just one factor may be sufficient in a particular case
to support a finding that termination is in the best interest of the child.[34]  On the other
hand, the presence of scant evidence relevant to each factor will not support
such a finding.[35]

In
addition to the evidence and findings discussed above, the record contains the
following evidence.  The psychologist who diagnosed V.Z. with post traumatic
stress disorder and major depressive disorder on Axis I and to whom V.Z.
admitted two prior suicide attempts recommended a psychiatric referral and
compliance with any psychiatric recommendations, counseling, and parent
education classes.  The psychologist testified that without ongoing treatment
or progress made in treatment, it would be difficult for V.Z. to place A.S.D.’s
best interest ahead of her own needs and feelings.  In early 2010, several
months after getting the psychological evaluation, V.Z. finally saw a
psychiatrist.  V.Z. admitted at trial that the psychiatrist had recommended
medication but that she refused to take it and that she had not seen the
psychiatrist since April 2010.

But V.Z.
did receive extensive counseling from a licensed clinical social worker,
participating in twenty-eight sessions instead of the standard twelve for a CPS
client, and completed parent education classes.  V.Z.’s counselor opined that
V.Z.’s depression improved through counseling.  Yet when asked what else
(besides motivation and willingness) V.Z. would need to become a good mother,
her counselor testified, “She needs stability, housing, a job, [to] be able to
protect the children, [to use] good judgment of course around the children.  We
haven't seen that, yet, unfortunately.”

By
V.Z.’s own account, she and A.S.D. moved at least seven times before A.S.D.’s
removal.  After the removal, V.Z. moved at least fourteen more times, sometimes
moving in with complete strangers, including two people she met while visiting Boyfriend
in jail and one person she met in a parking lot.  A few days before trial, she
secured an apartment, thanks to people from her church paying the first two
months’ rent.  But she still had no job and no work permit.

In
addition to the evidence of V.Z.’s protective actions concerning Boyfriend, the
letter that she wrote his criminal defense counsel discusses her desire to
marry him and raise a family with him.  This fact becomes especially
significant, given her prolonged denial of or ambivalence about his
responsibility for A.S.D.’s injuries and the facts that they already share a
child and that his sentence for reckless bodily injury was for only two years’
confinement and began over a year ago.

Upon
her release from the hospital, A.S.D. was placed with foster parents in a
stable home.  She has no remaining medical needs related to her injury and is
doing well in her foster home.  A.S.D. and the foster parents have bonded, and
the foster parents would like to adopt her if her birth parents’ rights are
terminated.

In
addition to the findings provided above, the trial court also entered the
following unchallenged findings of fact, all of which are supported by the
evidence:

25.     An
adversary hearing was held on July 24, 2009.  [V.Z.] appeared in person and
waived counsel and agreed to the entry of the temporary orders.

.
. . .  

33.     On
July 24, 2009, the Court entered temporary orders that specifically established
the actions necessary for [V.Z.] to obtain the return of [A.S.D.]

34.     On
July 24, 2009, [V.Z.] was ordered by the Court to participate in the following
services:  a psychological evaluation and follow the recommendations of the
psychological evaluation; participate in individual counseling and follow any
and all recommendations and continue until no further sessions are necessary;
participate in parenting classes until completion; and submit to drug testing
at the request of [the Texas Department of Family and Protective Services (TDFPS)].

35.     [V.Z.’s]
psychological evaluation recommended that she comply with a psychiatric
evaluation and follow the recommendations.  [V.Z.] did not follow the
recommendations of the psychiatric evaluation.

36.     [V.Z.]
was court ordered to establish and maintain safe and suitable housing and
refrain from engaging in criminal activity.  [V.Z.] was court ordered to
establish and maintain suitable employment for a period of at least six months
and continue through the pendency of the suit.

37.     During
the case, Children’s Medical Center staff, [TDFPS] staff, and CASA advocates
referred [V.Z.] to shelters to assist her with housing.

.
. . . 

39.     [V.Z.]
has been employed and had employment available to her during periods of her
life.  [V.Z.] had employment available to her during this case.  [V.Z.] did not
maintain suitable employment for a period of six months during this case.  While
being physically capable of being employed [V.Z.] instead relies on the charity
of strangers or relatives of her imprisoned boyfriend for support.

40.     [TDFPS]
made reasonable efforts to return [A.S.D.] to [V.Z.] by offering her services;
supporting her in working her services; support with her immigration status;
and support in referring her to community resources.

41.     CASA
supported [V.Z.] by supporting her in working her services; support with her
immigration status; and support in referring her to community resources.

.
. . . 

43.     [V.Z.]
has inadequate plans to parent [A.S.D.]  [V.Z.] does not have an adequate
social support system to aid her in the care of [A.S.D.]

44.     The
Court explicitly finds that at the present time [V.Z.] does not have the means
to support and care for herself, and therefore, does not have the means to
support and care for a young child.

.
. . . 

57.     [TDFPS]’s
plan for [A.S.D.] is adoption by foster parents who have cared for the child
since July 2009.  The Foster Parents have met the needs of [A.S.D.] while she
has been placed in their home.  The Foster Parents can provide a safe and
stable environment for the child.  The foster parents have an adequate support
system.

Applying
the appropriate standard of review, we hold that the evidence is factually
sufficient to support the best interest finding.  Having held that the trial
court’s endangerment findings are supported by legally and factually sufficient
evidence and that the best interest finding is supported by factually sufficient
evidence, we overrule V.Z.’s first two issues.

Because a
best interest finding and a finding of only one ground alleged under section
161.001(1) are sufficient to support a judgment of termination,[36]
we do not reach V.Z.’s fourth issue, which challenges the finding under
subsection (O).[37]

II. 
No Abuse of Discretion to Deny Extension of Dismissal Deadline

In
her third issue, V.Z. complains that the trial court abused its discretion by
not extending the case by 180 days because she needed more time to obtain a work
permit.  On April 20 and June 18, 2010, V.Z. filed motions to extend the
dismissal date by 180 days, but there is no mention of problems with her
immigration status in those motions.  We review a trial court's determination
on a motion for extension for an abuse of discretion.[38] 
Section 263.401 of the family code provides,

(a) Unless the court
has commenced the trial on the merits or granted an extension under Subsection
(b), on the first Monday after the first anniversary of the date the court
rendered a temporary order appointing the department as temporary managing
conservator, the court shall dismiss the suit affecting the parent-child
relationship filed by the department that requests termination of the
parent-child relationship or requests that the department be named conservator
of the child.

(b) Unless the court
has commenced the trial on the merits, the court may not retain the suit on the
court’s docket after the time described by Subsection (a) unless the court
finds that extraordinary circumstances necessitate the child remaining in the
temporary managing conservatorship of the department and that continuing the
appointment of the department as temporary managing conservator is in the best
interest of the child. If the court makes those findings, the court may retain
the suit on the court’s docket for a period not to exceed 180 days after the
time described by Subsection (a).[39]

On
June 18, 2010, twelve days before trial began and almost a year after the trial
court ordered that V.Z. obtain stable housing and stable employment for at
least six months, the trial court conducted a hearing on the motion filed June
18, 2010.  V.Z. testified that she requested an extension because it had been
difficult to find work during her pregnancy and because she had not yet
obtained a work permit.  She stated that she had an upcoming appointment for
the necessary fingerprinting and picture-taking on June 29, 2010.  She
testified unequivocally that after June 29, 2010, she would be able to be
legally employed in the United States.  On cross-examination, she acknowledged
that it was not certain that she would be able to work legally by that date
because another process would also have to be completed before she could work
legally in the country.  No evidence was offered or admitted to demonstrate why
the fingerprinting and picture-taking had not already taken place.

V.Z.
acknowledged that it was possible that her baby born May 24, 2010, was
conceived in August 2009, after A.S.D.’s removal, and she admitted that
Boyfriend fathered that baby.  She testified that she did not know that
Boyfriend had pled guilty to injuring A.S.D. and did not know if she believed
that he was guilty.  She admitted to visiting Boyfriend in jail and updating
him on the pregnancy.  She also admitted to missing visits with A.S.D. and
counseling sessions because of transportation issues, living in several
different places while the case was pending, and a several-month gap in
counseling.

V.Z.
argued that her recent pregnancy and her immigration status were extraordinary
circumstances.  TDFPS and A.S.D.’s ad litem opposed extending the case.  The
trial court denied the motion.

Given
the evidence presented in the hearing, especially that indicating a failure to
protect, we cannot say that the trial court abused its discretion
by failing to find that extraordinary circumstances justified a 180–day
extension of the dismissal deadline.[40]  We overrule V.Z.’s
third issue.

III. 
Constitutional Issues Waived

In
her fifth issue, V.Z. complains that she was deprived of due process guaranteed
by the Fourteenth Amendment of the United States Constitution.  In her sixth
issue, V.Z. complains that she was deprived of due course of law guaranteed by
section 19 of Article I of the Texas Constitution.  In her seventh issue, she
complains that she was deprived of equal protection guaranteed by both
constitutions.  To preserve a complaint for appellate review, a party must have
presented to the trial court a timely request, objection, or motion that states
the specific grounds for the desired ruling, if they are not apparent from the
context of the request, objection, or motion.[41] 
If a party fails to do this, error is not preserved, and the complaint is
waived.[42] 
The objecting party must get a ruling from the trial court.[43]  This ruling can be either
express or implied.[44]

Because
V.Z. failed to raise these constitutional complaints below, she has failed to
preserve them for appeal.  We therefore overrule V.Z.’s fifth, sixth, and
seventh issues.

IV. 
Conclusion

Having
overruled V.Z.’s dispositive issues, we affirm the trial court’s judgment.

 

 

LEE ANN DAUPHINOT
JUSTICE

 

PANEL: 
LIVINGSTON,
C.J.; DAUPHINOT, J.; and WILLIAM BRIGHAM (Senior Justice, Retired, Sitting by
Assignment).

 

DELIVERED:  November 17,
2011









[1]See Tex. R. App. P. 47.4.





[2]See Tex. Fam. Code
Ann. § 161.001(1)(D), (E), (2) (West Supp. 2011).





[3]Act effective Sept. 1,
2005, 79th Leg., R.S., ch. 176, § 1, 2005 Tex. Gen. Laws 332, 332 (adding
subsection (i), requiring statement of points, to section 263.405 of the family
code), repealed by Act effective Sept. 1, 2011, 82nd Leg., R.S., ch. 75,
§§ 5, 8, 2011 Tex. Gen. Laws 348, 349 (deleting subsection (i) but noting that
former section 263.405 is still in effect for final orders rendered before
September 1, 2011).





[4]See id.; In
re J.H.G., 302 S.W.3d 304, 306 (Tex. 2010) (holding mother’s failure to
raise challenge to trial court’s extension of statutory deadline in her
statement of points waived issue).





[5]Tex. Fam. Code Ann. § 161.001
(West Supp. 2011); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).





[6]Tex. Dep’t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987); In re D.T., 34
S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied).





[7]Tex. Fam. Code Ann. § 161.001;
see also § 161.206(a) (West 2008).





[8]Id. § 101.007
(West 2008).





[9]In re J.F.C., 96
S.W.3d 256, 263 (Tex. 2002); see In re J.A.J., 243 S.W.3d 611,
616 (Tex. 2007) (contrasting standards for termination and modification).





[10]In re J.P.B., 180
S.W.3d 570, 573 (Tex. 2005).





[11]Id.





[12]Id.





[13]Id.





[14]Id.





[15]Id.





[16]Id. at 573, 574.





[17]Id. at 573.





[18]In re H.R.M., 209
S.W.3d 105, 108 (Tex. 2006).





[19]Tex. Fam. Code Ann. § 161.001;
In re C.H., 89 S.W.3d 17, 28 (Tex. 2002).





[20]H.R.M., 209 S.W.3d
at 108.





[21]Bellefonte
Underwriters Ins. Co. v. Brown, 704 S.W.2d 742, 744–45 (Tex. 1986).





[22]Anderson v. City of
Seven Points, 806 S.W.2d 791, 794 (Tex. 1991).





[23]Ortiz v. Jones,
917 S.W.2d 770, 772 (Tex. 1996); Catalina v. Blasdel, 881 S.W.2d 295,
297 (Tex. 1994).





[24]McGalliard v. Kuhlmann,
722 S.W.2d 694, 696 (Tex. 1986); Rischon Dev. Corp. v. City of Keller, 242
S.W.3d 161, 166 (Tex. App.—Fort Worth 2007, pet. denied), cert. denied,
129 S. Ct. 501 (2008).





[25]In re J.W., No.
02-08-00211-CV, 2009 WL 806865, at *4 (Tex. App.—Fort Worth Mar. 26 2009, no
pet.) (mem. op.) (citations omitted).





[26]In re M.E.-M.N.,
342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied).





[27]In re J.O.A., 283
S.W.3d 336, 346 (Tex. 2009).





[28]See McGalliard,
722 S.W.2d at 696; Rischon Dev. Corp., 242 S.W.3d at 166.





[29]In re R.R., 209
S.W.3d 112, 116 (Tex. 2006).





[30]Tex. Fam. Code Ann. § 263.307(a)
(West 2008).





[31]Id. § 263.307(b);
R.R., 209 S.W.3d at 116.





[32]Holley v. Adams,
544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).





[33]C.H., 89 S.W.3d at
27.





[34]Id.





[35]Id.





[36]In re E.M.N., 221
S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).





[37]See Tex. R. App.
P. 47.1.





[38]In re D.W., 249
S.W.3d 625, 647 (Tex. App.—Fort Worth), pet. denied, 260 S.W.3d 462
(Tex. 2008).





[39]Tex. Fam. Code Ann. §
263.401 (West 2008).





[40]See In re D.K.,
No. 02-09-00117-CV, 2009 WL 5227514, at *2 (Tex. App.—Fort Worth Dec. 31, 2009,
no pet.) (mem. op.) (holding that trial court’s determination that mother who
had failed to visit children during pendency of case failed to present
extraordinary circumstance was not abuse of discretion); In re L.D.K.,
No. 02-07-00288-CV, 2008 WL 2930570, at *3 (Tex. App.—Fort Worth July 31, 2008,
no pet.) (mem. op.) (holding father who argued service plan was deficient
because of misnomer despite evidence that he knew what was expected of him
failed to present any extraordinary circumstances that would necessitate an
extension); Shaw v. Tex. Dep’t of Family & Protective Servs., No.
03-05-00682-CV, 2006 WL 2504460, at *8 (Tex. App.—Austin Aug. 31, 2006, pet.
denied) (mem. op.) (holding mother did not show that needing more time after
failing to make progress on the service plan for eight months amounted to
extraordinary circumstances).





[41]Tex. R. App. P. 33.1(a); see
also Tex. R. Evid. 103(a)(1).





[42]Bushell v. Dean,
803 S.W.2d 711, 712 (Tex. 1991) (op. on reh’g).





[43]Tex. R. App. P.
33.1(a)(2), (b).





[44]Id.; Frazier v.
Yu, 987 S.W.2d 607, 610 (Tex. App.—Fort Worth 1999, pet. denied).